UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

NO. 06:08-CR-105-GFVT

UNITED STATES OF AMERICA                                              PLAINTIFF


V.                              RECOMMENDED DISPOSITION


MICHAEL REDMOND and
NANNETTE REDMOND                                              DEFENDANTS

* * * * * * * * * *


The Court considers Motions to Suppress[1] filed by Defendants Michael Redmond and

Nannette Redmond.  *See* DE #56 & #53; *see also* DE #60 Joinder Motion.  The Redmonds, along

with various Co-Defendants, face meth manufacturing and related charges that assert a conspiracy

to make meth in Pulaski County from July 2007 to July 2008.  *See* DE #30 Superceding Indictment.

Defendants argue that the July 2008 warrantless search of a vehicle owned by Michael

Redmond and driven by Nannette Redmond was improper because the searching officer lacked

probable cause or other lawful justification.  Because the results of the vehicle search provided

critical evidence in support of a subsequent residential warrant, Defendants likewise impeach the

warrant.[2]  The United States responded in opposition.  *See* DE #64 & DE #70.  The Court held a

---

[1]

A defendant seeking to suppress evidence carries "the burden of establishing a prima facie
case."  *See United States v. Murrie*, 534 F.2d 695, 697 (6th Cir. 1976).  Once the defendant
establishes a prima facie case, the burden then shifts to the government to prove the validity of the
search.  *See id.* at 698.  However, without question, "[t]he government has the burden of proving the
legality of a warrantless search."  *See United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007).

[2]

Also, Nannette Redmond presents a distinct *Miranda* argument, which the Court includes

lengthy evidentiary hearing on November 25, 2008, *see* DE #75 ("Tr."), and permitted counsel for both parties to submit post-hearing briefs in lieu of oral argument. *See* DE #74 Minute Entry Order. All parties submitted timely post-hearing briefs. *See* DE #79 Nannette Redmond Post-Hearing Brief; DE #80 Michael Redmond Post-Hearing Brief; DE #81 Reply Brief. Having reviewed the briefs, the full hearing transcript, the record, and applicable law, the Court recommends that the District Court DENY the Motions to Suppress as to both Defendants.

## I. The Hearing

The Court summarizes the facts, as established during the evidentiary hearing. Notably, neither Defendant testified, and the record for decision includes only testimony from law enforcement personnel on the scene during the events in question.

On July 27, 2008, Director David Gilbert[3] of the Lake Cumberland Area Drug Task Force received a phone call from a female Lowe's employee in Somerset regarding a female's purchase of "two cannisters of what she called a yellow bottle lye, drain cleaner." *See* Tr., at 9. Based on his training and experience, Gilbert expected the cleaner would be "Roebic brand sodium hydroxide 100 percent," which the witness has encountered only "on the shelves of that particular store" and "at methamphetamine clandestine labs[.]" *See id.* at 9-10; *see id.* at 11 (Gilbert noting he'd seen "hundreds of these containers"). Gilbert knew the Roebic to have a distinctive yellow label, *see id.* at 11, and identified that product with Lowe's in particular: "The only thing at Lowe's, that

within the Recommended Disposition.

[3]

Gilbert has 33+ years in law enforcement, including stints as a city policeman, narcotics officer, chief of police (Somerset), and drug task force officer (as director and deputy director). *See* Tr., at 8-9.

2

particular store, is the Roebic[.]" *See id.* at 63.  He strongly linked Roebic with meth production.

Referencing meth labs, Gilbert observed: "It's always the 100 percent Roebic."  *See id.*

The employee gave a detailed physical description of the purchaser and also indicated that the female had "iodine fingers," *see id.* at 10, a description that caused Gilbert "concern" because "iodine is a common component . . . normally utilized in a red phosphorous lab for the manufacture of methamphetamine."  *See id.* at 11.  In addition to the physical description of the purchaser, the Lowe's employee provided Director Gilbert with the license plate number for "a two-tone, full-sized, blue pick-up truck" driven by the purchaser.  *See id.* at 13.  A call from an area store that sells products utilized in meth making is not a rare occurrence, and the local task force has communicated with stores concerning items of interest.  *See id.* at 62-63.  Gilbert viewed the amount purchased – two 20 oz. cannisters of drain cleaner – as inherently suspect: "Yes, unless the person – the customer was a plumber . . . I've got drain cleaner . . . at home, and I probably had it for ten years, one can, so it would be unusual, I would think, to buy two."  *See id.* at 12.

Based on this information, Director Gilbert conducted a registration check on the license plate.  *See id.*  According to the Somerset-Pulaski 911 dispatch, the license plate "was registered on a blue Ford pick-up . . . to a Mike Redmond of 301 Breezy Hills, Somerset, Kentucky."  *See id.* at 13.  Gilbert knew that his task force, other agencies, and the DEA had been investigating "a Michael Redmond . . . for several years now."  *See id.* ("We've seen – received numerous complaints.").  Gilbert's task force had an open investigation of Michael Redmond concerning meth manufacturing.  *See id.*

Director Gilbert then contacted Officer Scott Whitaker, who was a case officer (one of two so assigned) investigating Michael Redmond as part of the Lake Cumberland Drug Task Force.  *See*

3

*id.*; *id.* at 80 (Whitaker began his investigation because of "a complaint . . . from Wal-Mart in [the] jurisdiction of Michael Redmond attempting to steal some lithium batteries, along with other items."); *id.* at 80-81 (Whitaker was aware of "an active investigation [of Michael Redmond] that was at the federal level.").

From the description of the Lowe's call, and based on the registration, Officer Whitaker told Director Gilbert "it was probably Nan[n]ette Redmond that was in the vehicle" and confirmed the Breezy Hills address as the Redmond home. *See id.* at 82, 83. Whitaker also confirmed his investigation of the Breezy Hills address in December 2007, during which he spoke to current Co-Defendants Ami Beckman and Casey Redmond,[4] seized an amount of meth and marijuana pursuant to a safety sweep of the residence, and found out directly from both Beckman and Redmond that "there were different family members buying products for Mr. Redmond to manufacture – to assist in manufacturing" methamphetamine. *See id.* at 14-15, 83; *see also* DE #71-2 Exhibit A to Michael Redmond Motion, at 5. Indeed, per Officer Whitaker, "Whenever I had conducted the taped interviews in December with Casey Redmond and Am[i] Beckman, they had also explained that Nan[n]ette Redmond was also purchasing items to assist Michael Redmond in the manufacturing." *See* Tr., at 102-03; *id.* at 81 (noting that both Beckman and Casey Redmond admitted securing pseudoephedrine for Michael Redmond and also knowing that Michael Redmond used the pseudoephedrine to produce meth.). Nannette Redmond is Casey Redmond's mother.

---

[4]

Attachment B to the search warrant affidavit lists Cornelius Redmond as the person Officer Whitaker spoke to at Michael Redmond's home in December 2007. *See* DE #71-2 Exhibit A to Michael Redmond Motion, at 5. However, Officer Whitaker later determined that "Casey Redmond had given [him] fake [identifying] information that day . . . [and] [e]verything was documented as him being his brother[.]" *See* Tr., at 91.

4

[Importantly, during that same visit to Breezy Hills, Whitaker knew that Wal-Mart had accused Michael Redmond of stealing lithium batteries during the purchase of other items; that accusation prompted the visit to the address by Whitaker.  The officer indicated that most of the items on a Wal-Mart receipt he viewed, *see id.* at 90, would be used in meth-making, *see id.* at 99, and the batteries also would be so used.  Finally, in addition to finding finished meth at Breezy Hills on the date in December, around 5 grams, *see id.* at 92, Whitaker also "could smell a strong chemical odor around the residence," *see id.* at 93, which he linked to lithium batteries.  *See id.* at 94.]

After speaking with Officer Whitaker, Director Gilbert (who resides in the area) immediately drove toward the Breezy Hills address in an attempt to locate the truck involved in the tip.  *See id.* at 16.  He sighted the truck on the road, with plates and car details matching the Lowe's tip, *see id.* at 17, and caught up with it as Nannette Redmond backed into the driveway of 301 Breezy Hills.  *See id.* at 17-18.  Director Gilbert parked his car in an adjacent driveway and met Nannette Redmond as she exited the truck.  *See id.* at 18.  Defendant produced identification (confirming her identity and her residence at Breezy Hills) and denied Director's Gilbert's request to search the vehicle.  *See id.* at 18-19.  Gilbert believed that Nannette Redmond matched the "exact description," given by the Lowe's tipster.  *See id.* at 18.[5]

Michael Redmond immediately met Gilbert and Nannette Redmond in the driveway and also refused consent to a search of the truck.  *See id.* at 19-20.  Gilbert confirmed Michael Redmond's identity.  *See id.*  He knew that the Redmonds were or had been married.  *See id.* at 28.  Neither Redmond had much to say, although Gilbert tried to ask about the residence's burned out garage.  *See id.* at 20.  Curiously, Nannette Redmond claimed that she was taking the drain cleaner purchased

---

[5]

Gilbert did not specifically notice Redmond's "hands or fingers."  *See* Tr., at 18.

to a friend: "[S]he said, 'I'm on my way to take it to a friend and I'm just going to stay here a few minutes[.]" *See id.* at 28; *id.* at 54 ("She said . . . she was taking the product that she had purchased to a friend.").

Subsequently, after becoming "somewhat concerned" because Michael Redmond kept moving closer toward him, Director Gilbert called 911 to request officer assistance at the Breezy Hills address. *See id.* at 21. Once the two sheriff's deputies arrived, which happened within about two minutes of the call, Gilbert asked the officers to perform a protective sweep of the home.[6] The deputies did not find any other persons inside the residence.

While the deputies kept watch over the Redmonds, Gilbert looked into the passenger side of the truck and saw "a plastic bag . . . that had a grayish tint to it . . . [and] a little bit of a yellow

---

[6]

The protective sweep of the home did not uncover any evidence nor provide a basis for the search warrant application. However, the Court notes that Gilbert's decision to direct the deputies to conduct a protective sweep was questionable under Fourth Amendment jurisprudence. Gilbert did not have a search warrant, making the protective sweep per se unreasonable. *See United States v. McLevain*, 310 F.3d 434, 438 (6th Cir. 2002). The presence of exigent circumstances could have justified the warrantless entry, but the totality of the circumstances in this case does not support a finding of exigency as to the trailer. *See United States v. Harris*, 158 F. App'x 719, 723 (6th Cir. 2005)(noting that a court evaluating the existence of exigent circumstances must "'consider the totality of the circumstances and the inherent necessities of the situation at the time'")(quoting *United States v. Plavcak*, 411 F.3d 655, 663 (6th Cir. 2005)); *see also United States v. McClain*, 444 F.3d 556, 561 (6th Cir. 2005)("[T]he police may not enter a private residence without a warrant unless both 'probable cause plus exigent circumstances' exist.")(quoting *Kirk v. Louisiana*, 122 S. Ct. 2022, 2459 (2002)(per curiam)). At the evidentiary hearing, Gilbert testified that he asked the deputies to do a safety sweep of the home because he "was very worried about especially [his] safety and theirs[.]" *See* DE #75 Tr., at 23. However, when asked about his specific observations regarding the home, Gilbert stated that "the screen door was propped . . . open," he was not aware of the presence of anyone other than Defendants, and "[he] kept looking at the door and . . . couldn't see anybody inside, any shadows or anything." *See id.* at 21. Additionally, Gilbert testified that, at the time he searched the truck, he did not have sufficient probable cause to get a search warrant for the house. *See id.* at 49. Based on these facts, the basis for any safety sweep of the home is quite dubious; however, since the sweep produced no evidence undergirding the ultimate search warrant, Defendants make no direct argument about the propriety of that sweep.

can in it." *See id.* at 24; *id.* at 25 (noting that the part he saw was "either the top or the bottom of a yellow canister, like a spray that you'd use for spray painting"); *id.* at 74 (agreeing with defense counsel's characterization that Gilbert "could see about an inch of a yellow container"). Newspapers and a piece of orange poster board hid from view the great majority of the shopping bag. *See id.* Gilbert firmly suspected that the can he saw was another meth-making ingredient: "Absolutely. . . . It's the same thing I find at almost every lab that I've ever worked, is Prestone starting fluid. It's in a yellow can with a yellow top." *See id.* at 25; *id.* at 66 (stating, "[T]hat could have been a yellow can of spray paint. I would have bet 99 percent it wasn't[.]").[7]

Director Gilbert then opened the passenger door, lifted the poster board and newspapers, and confirmed three cans of Prestone starter fluid and another chemical in "a fairly good-sized plastic container." *See id.* at 26; *id.* at 35 (Gilbert noting that the other item, first thought to be iodine, turned out to be peroxide). He replaced the poster board and newspapers and directed the deputies to secure Nannette Redmond in the back of their car. *See id.*

After thus placing Nannette Redmond under arrest, Director Gilbert read her the *Miranda* warnings and asked where she had put the two cans of Roebic drain cleaner. *See id.* at 27. Nannette Redmond told Gilbert that the drain cleaner was in a tool box in the bed of the truck. *See id.* at 29. Defendant also allegedly stated that it was she who "'was going to do the cook.'" *See id.* at 59; *see*

---

[7]

The defense heartily impeached Gilbert for not mentioning the sliver of visible can in either the warrant application or his field report. *See* Tr., at 36, 58. The application certainly identified that shopping bags were visible but did not reference the can. Because Gilbert felt he had probable cause to search the vehicle anyway, *see id.* at 49, the Court does not view the omission as particularly relevant to Gilbert's credibility, in the context.

*also id.* at 28 (Gilbert: "And she said, 'I was going to use it to cook.'"). She refused additional interrogation.[8]

Director Gilbert confirmed the location of the drain cleaner and called for assistance from his Task Force. *See id.* at 29. When Officer Whitaker arrived, Gilbert related events at the scene. *See id.* at 84. Using this information, along with an affidavit regarding his own December 2007 investigative visit to the Breezy Hills address, Officer Whitaker prepared a search warrant application for the residence. *See id.* at 84-85. In addition to detailing much of the basis already discussed, Whitaker's affidavit further related the criminal records of Michael and Nannette Redmond. Importantly, authorities were aware of the Redmonds' record at the time of the July 2008 interaction. Whitaker, per Gilbert, relayed some elements of the record to Gilbert, and Whitaker had learned of Michael Redmond's prior alleged conduct relative to the December 2007 investigation. *See id.* at 15; 81. The record reflects that, at the time of the July 2008 interaction between the Redmonds and Gilbert, law enforcement knew that Nannette Redmond had a drug paraphernalia conviction from February 2006; Nannette Redmond had a dismissed concealed weapon charge from 2002; Michael Redmond had felony controlled substance convictions, regarding possession, from 1997 and from 2002 (two 2002 convictions yielding 2 years of prison). *See id.* at 80, 100 (discussing criminal history and awareness); 13 (same, as to DEA); 15, 66 (same, as to concealed weapon, drug paraphernalia arrests of Nannette Redmond); DE #71-2 Attachment B (enumeration of criminal history attached to warrant application).

---

[8]

Omission of this statement from the affidavit and report also drew significant defense criticism. The information did not make the four corners of the affidavit and post-dated the vehicle search, so the Court finds no need to assess the effect of that omission.

A Pulaski District Judge issued the warrant, and the residence search yielded incriminating evidence. Based on the evidence uncovered in the truck and the residence, a federal grand jury indicted Defendants on charges of conspiracy to manufacture 50 grams or more of methamphetamine (21 U.S.C. § 846), unlawful possession of pseudoephedrine (21 U.S.C. § 841(c)(2)), and conspiracy to grow and produce less than 50 plants of marijuana (21 U.S.C. § 846). *See* DE #30 Superceding Indictment, at 1-2. Defendants Michael Redmond and Nannette Redmond now seek suppression of the evidence found pursuant to the warrantless search of the truck and the warrant-based search of the residence. Defendant Nannette Redmond additionally seeks to suppress all statements she made to Director Gilbert.

## II. Standing

In order to challenge the propriety of a search, a defendant must have standing as demonstrated by proof that "the defendant's own constitutional rights have been violated." *See United States v. Davis*, 430 F.3d 345, 359-60 (6th Cir. 2005). The key to determining standing is "whether a defendant can establish 'a legitimate expectation' of privacy in the area searched or the items seized." *See id.* at 360; *see also Minnesota v. Carter*, 119 S. Ct. 469, 472 (1998)("[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable."). When, as here, multiple defendants seek to challenge the validity of a search, courts examine the privacy interests for *each* defendant; thus, in some cases, and even concerning a single search, one defendant may have standing to assert a challenge while another defendant lacks standing. *See Davis*, 430 F.3d at 360 (holding that a search violated one defendant's Fourth Amendment rights but not the other defendant's rights because the second defendant had no "reasonable expectation of privacy").

9

Obviously, ownership of a vehicle or home searched normally would suffice. *See United States v. Thomas*, 447 F.3d 1191, 1187 (9th Cir. 2006)(noting that "owner of an automobile . . . has standing"). However, a nonowner with a sufficient "possessory" interest in a place searched or thing seized – *e.g.*, by joint control or common authority – likewise can challenge the intervention. *See id.* at 1198 (citing *Carter*, 119 S. Ct. at 472).

The United States does not contest standing as to either movant or either search site, and the Court finds that both Nannette Redmond and Michael Redmond have standing to challenge the validity of the searches of the truck and of the Breezy Hills residence. As the owner of truck and the owner and a resident of the Breezy Hills home, Michael Redmond has an obvious expectation of privacy as to both. As for Nannette Redmond, it is apparent contextually that she used the Redmond vehicle that day with permission. Michael Redmond was at the home when Nannette Redmond returned, and he immediately met her and Gilbert in the driveway. Both refused consent to search. Further, Nannette Redmond purchased at least some of the items seized from the vehicle, contributing to a finding of standing.

Nannette Redmond also had an expectation of privacy in the Breezy Hills address. Her identifying driver's license listed the address as her residence. *See* Tr., at 18. At the time of her arrest on the underlying indictment, Nannette Redmond was alone at the Breezy Hills address. *See* DE #25 Detention Order, at 5, 9. Further, the detention record reflects that Redmond lived both at the Breezy Hills address and in a trailer in Bronston, Kentucky and received mail at the Breezy Hills address. *See id.* Because her status, at a minimum, is more like an overnight guest than someone who is "merely present," Nannette Redmond has standing to challenge the 2008 search of the Breezy Hills residence. *See Carter*, 119 S. Ct. at 473 ("[A]n overnight guest in a home may claim the

10

protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not.").

### III. Fourth Amendment Analysis

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures[.]" *See* U.S. CONST. amend. IV (emphasis added).  In order to protect this right, the United States Supreme Court, in *Weeks v. United States*, 34 S. Ct. 341 (1914), "barred the use of evidence secured through an illegal search and seizure." *See Wolf v. People of the State of Colorado*, 69 S. Ct. 1359, 1361 (1949)(discussing the holding of *Weeks*).  Later, the Supreme Court extended the same rule to the states via the Fourteenth Amendment. *See Mapp v. Ohio*, 81 S. Ct. 1684, 1691 (1961).

When evaluating claims under the Fourth Amendment, courts seek to determine "whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *See Smith v. Maryland*, 99 S. Ct. 2577, 2580 (1979)(citations omitted).  To this end, courts require: 1) "that a person have exhibited an actual (subjective) expectation of privacy" and 2) "that the expectation be one that society is prepared to recognize as 'reasonable.'" *See Katz v. United States*, 88 S. Ct. 507, 516 (1967)(Harlan, J., concurring); *Smith*, 99 S. Ct. at 2580 (citing and applying the two-part inquiry articulated by Justice Harlan).

Courts normally consider a warrantless search per se unreasonable. *See United States v. McLevain*, 310 F.3d 434, 438 (6th Cir. 2002).  However, exceptions exist, and not every warrantless search is improper. *See United States v. Radka*, 904 F. 2d 357, 361 n.3 (6th Cir. 1990) (listing exceptions to the warrant requirement).  Significant to this case, the "automobile exception" permits

a police officer to search a vehicle without a warrant provided he or she has probable cause sufficient for obtaining a warrant.  *See Carroll v. United States*, 45 S. Ct. 280, 285 (1925); *see United States v. Smith*, 510 F.3d 641, 647-48 (6th Cir. 2007)(discussing probable cause formulation under "automobile exception").   Further, during a legitimate *Terry* encounter, an officer "may search areas in a vehicle where a weapon may be placed or hidden if the officers possess a reasonable belief, based on specific and articulable facts, that the suspect is dangerous and the suspect may gain immediate control of weapons."  *United States v. Terrell*, 95 F. App'x. 746, 748 (6th Cir. 2004).

Here, Defendants ask the Court to suppress evidence found in the truck, arguing that Gilbert lacked probable cause to conduct a search of the Redmond vehicle.  The United States primarily contends that Gilbert's search was proper under danger-based exigencies reflected in *Terry*- type and safety-based warrant exceptions.  *See* DE #64-2 Response, at 1; DE #81 Post Hearing Response, at 1 (reasserting "all arguments made in its previous written submission").  If the search of the truck was improper, Defendants challenge the residential search as premised on illegal fruit.[9]  The Court examines the propriety of the search under all theories implicated in the briefing and hearing.

A. Search of the Truck

a. *Terry* and safety

An officer may stop a person for questioning if the officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant

---

[9]

Thus, per *United States v. Shamaezadeh*, 80 F.3d 1131, 1136 (6th Cir. 1996), Defendants contend that the Court must drop elements of the warrant application derived from the vehicle and analyze for probable cause without that tainted information.  Notably, Defendants do not contend that the warrant application as originally presented, and including all information, lacks probable cause.

that intrusion." *See Terry v. Ohio*, 88 S. Ct. 1868, 1880 (1968).  Courts use an objective test, rather than the subjective beliefs of the questioning officer, to evaluate the reasonableness of a *Terry* stop. *See United States v. Vite-Espinoza*, 342 F.3d 462, 466 (6th Cir. 2003).

Additionally, an officer making an investigative stop pursuant to *Terry* may conduct a weapons search "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other instruments for the assault of the police officer." *See Terry*, 88 S. Ct. at 1884.  The principles of *Terry*, thus, do **not** extend to a search for evidence. *See United States v. Garcia*, 496 F.3d 495 (6th Cir. 2007)("The *Terry* doctrine permits only a search for weapons, not for evidence in general."); *Adams v. Williams*, 92 S. Ct. 1921, (1972)("The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence[.]"); *United States v. Strahan*, 984 F.2d 155, 158 (6th Cir. 1993)("*Terry* allows only an examination for concealed objects and forbids searching for anything other than weapons.").  A search for weapons pursuant to *Terry* is proper when the officer can point to "reasonable and articulable facts that an individual is armed and dangerous." *See United States v. Goodwin*, No. 98-6415, 2000 WL 64972, at *4 (6th Cir. Jan. 12, 2000).  Again, for *Terry* search authority to encompass the passenger area of a vehicle, police must have "specific and articulable facts, that the suspect is dangerous and the suspect may gain immediate control of weapons." *See Terrell*, 95 F. App'x. at 748.

Additionally, a safety-based warrant exception exists for a sufficient exigency reflecting danger to an officer or the public.  The Government bears the burden "of proving exigent circumstances exist." *See United States v. Pollard*, 215 F.3d 643, 648 (6th Cir. 2000).  Any such exigency must be specific and sufficiently urgent to justify immediate intervention without delay

to secure a warrant. *See United States v. Beasley*, No. 95-6289, 1996 WL 428336, at *2 (6th Cir. July 30, 1996)(noting that, for exigency to exist, there must be "real immediate and serious consequences that would certainly occur were a police officer to postpone action to get a warrant"); *see also United States v. Purcell*, 526 F.3d 953, 961 (6th Cir. 2008)(rejecting an exigency argument to validate a warrantless search despite the dangerousness of methamphetamine manufacturing because the record did not indicate that any of the officers believed that "methamphetamine cooking was ongoing" at the time).

Here, Director Gilbert approached Nannette Redmond after she already had arrived at the Breezy Hills address and was exiting or preparing to exit the vehicle. He did not "stop" the vehicle or Defendant, but rather encountered both in the open driveway of the home. The approach, then, is legitimate even outside *Terry*, at least up to the point of the vehicle search; police may walk onto the driveway of a home and seek to interview occupants with or without cause, so long as authorities do not exceed the scope of a permissible "knock and talk." *See, e.g., Hardesty v. Hamburg Township*, 461 F.3d 646, 654 (6th Cir. 2006)("[O]fficers' entry into the curtilage in order to effectuate a knock and talk investigative technique did not violate Plaintiffs' Fourth Amendment rights."); *United States v. Reed*, 733 F.2d 492, 501 (8th Cir. 1984)("[N]o Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors - such as driveways, walkways, or similar passageways.").

The search of the vehicle is a proper subject of *Terry* analysis. The United States argues that Gilbert validly confirmed the starter fluid in the floorboard because of the risk that the truck contained either a weapon or dangerous meth-related ingredients. While Gilbert offered some

14

support for each theory, the Court finds the evidence lacking under *Terry* and *Michigan v. Long*, 103 S. Ct. 1032 (1983).

Director Gilbert did not possess a belief, based on specific, articulable observations, that Defendants possessed weapons or posed an individual danger. Gilbert testified that Nannette Redmond was wearing very short cut-off jeans, and Michael Redmond was wearing only shorts; thus, an excess of clothing did not hide from view any weapons on the person of either Defendant. *See* DE #75 Tr., at 19 (Gilbert testifying that Nannette Redmond was wearing "very, very short cut-off blue jeans"); *id.* (Gilbert testifying that Michael Redmond "didn't have a shirt on . . . [and] was wearing shorts maybe"). Additionally, even though Director Gilbert testified to the general tendency to find firearms and methamphetamine labs together, *see id.* at 30, 67-68, he failed to establish a fair belief that these specific Defendants were armed. *See id.* at 53, 55. Finally, Director Gilbert testified that, generally speaking, methamphetamine users can be "very paranoid" to the point of "fighting with . . . and injuring agents." *See id.* at 68. However, he also testified that Defendants did not look like meth users. *See id.* at 68-69. Taken together, these facts do not indicate a reasonable belief that Defendants were or could be armed.

The Court notes several items inconsistent with a *Terry*-based search of the vehicle. Gilbert elected to approach Nannette Redmond alone, at the known Redmond residence and with full knowledge of the Redmonds' alleged history (including the December 2007 events). He did this despite knowing that he could secure back-up within two minutes. Although he said that Michael Redmond at some point made him "uncomfortable" by being "kind of in my space," *id.* at 20, Gilbert at no point cuffed or even *frisked* either Redmond. *See id.* at 64, 69. Neither Redmond threatened Gilbert in any way. *See id.* at 48. Further, and other than referencing a weapon

15

possession charge as to Nannette from several years prior, Gilbert admitted he had no specific reason to think the Redmonds were armed. *See id.* at 67. The analysis is objective, but Gilbert's manner and conduct must color the inferences to be drawn.

As to the link between meth manufacturing and weapons, Gilbert did associate meth labs and meth users with weapons, based on his training and experience. *See id.* at 30, 68. However, the witness did not establish that the scene encountered – in the Redmonds' driveway – actually featured active manufacturing (versus ingredient gathering) at the time. Gilbert did not testify to smelling lab indicia, and he knew that Nannette Redmond had just left Lowe's with what he thought was an element of the process. Importantly, once Gilbert confirmed the starter fluid, he did not search further in the vehicle. *See id.* at 77. Thus, the *Terry/Michigan v. Long* search authority encompasses only weapons in the passenger area, and Gilbert did not, at any point, actually conduct such a search. His conduct undercuts the reasonableness of the perception now described. Additionally, by the time Gilbert opened the door, any danger had greatly decreased because other officers had arrived to "watch" the Redmonds. *See id.* at 23. Finally, Gilbert admitted that he did not suspect that the Redmonds were active users on the date in question. *See id.* at 73.

Director Gilbert's articulation of the dangers posed by the caustic nature of the drain cleaner and other chemicals did not justify a weapons search pursuant to *Terry* or exigency principles. According to the Lowe's employee, Nannette Redmond *purchased* the two bottles of drain cleaner; Director Gilbert objectively had no reason to believe that Nannette Redmond had compromised the integrity of the containers. *See id.* at 9, 53-54. Gilbert's own actions suggest he was not concerned with handling the items: without taking any safety precautions or awaiting the arrival of experts in the handling of hazardous materials, Director Gilbert opened both the shopping bag in the passenger

16

compartment of the truck and the tool box containing the purchased drain cleaner. *See id.* at 26, 29; *id.* at 61-62 (agreeing that search occurred without protective gear). Additionally, despite Officer Whitaker's testimony regarding the distinctive smell of methamphetamine labs, *see id.* at 94, Director Gilbert did not indicate that he detected (or even suspected) through smell a "one-step lab" within the truck. *See id.* at 32-33 (Gilbert's testimony regarding one-step labs). Thus, any attempted justification based on his knowledge and experience regarding "one-step labs" and the general dangers that accompany chemical reactions in clandestine methamphetamine manufacturing does not withstand objective scrutiny on the record. *See Purcell*, 526 F.3d at 961 (noting that meth danger "is primarily tied to the heating process and the resulting fumes or explosiveness; on their own, the ingredients are safe enough[.]"); *id.* ("[E]vidence of a methamphetamine laboratory by itself is not always sufficient to create an exigency."). The exigency standard is a **high** one, and the United States would have to establish the need "for prompt action by government personnel, and conclude that delay to secure a warrant would be unacceptable under the circumstances." *See id.* (quotation omitted). As *Purcell* stressed, relative to the Government's burden, "Qualification for this exception is not easy, for '[w]hen there is neither a warrant nor consent, courts will only permit a search or seizure to stand under extraordinary circumstances.'" *See id.* at 960 (quoting *United States v. Chambers,* 395 F.3d 563, 565 (6th Cir. 2005)). In this particular situation, the record does not meet that high threshold for an exception to the warrant clause. *See also United States v. Atchley*, 474 F.3d 840, 851 (6th Cir. 2007)("Exigent circumstances must be unanticipated ....").

    The evidence also did not establish "'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *See United States*

*v. Graham*, 483 F.3d 431, 438 (6th Cir. 2007).   As such, neither *Terry* or a danger exigency justified the search.

### b. Probable Cause and the Automobile Exception

The Court does find, however, in what is a close case, that probable cause supported the vehicle search.  The United States Supreme Court has "long recognized an exception to the warrant requirement with respect to searches of vehicles."  *See United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007); *Carroll*, 45 S. Ct. at 285 (setting forth the automobile exception to the warrant requirement).  The automobile exception is based on two premises – the "ready mobility" of and a lessened expectation of privacy in an automobile – and carries "no separate exigency requirement." *See id.*; *California v. Carney*, 105 S. Ct. 2066, 2070 (1985)("[T]he pervasive schemes of regulation, which necessarily lead to reduced expectations of privacy, and the exigencies attendant to ready mobility justify searches without prior recourse to the authority of a magistrate so long as the overriding standard of probable cause is met."); *Maryland v. Dyson*, 119 S. Ct. 2013, 2014 (1999)("[U]nder our established precedent, the 'automobile exception' has no separate exigency requirement.").

Pursuant to the automobile exception, a search of a vehicle "is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained."  *See United States v. Ross*, 102 S. Ct. 2157, 2164-65 (1982)(holding that the automobile exception to the warrant requirement "applies only to searches of vehicles that are supported by probable cause").  Thus, an officer properly may search a vehicle if he or she has probable cause to believe that the vehicle contains "contraband or evidence of a crime."  *See Illinois v. Gates*, 103 S. Ct. 2317, 2332 (1983)(discussing probable cause finding by a magistrate); *United States v. Graham*,

275 F.3d 490, 510 (6th Cir. 2001)(noting requirement of probable cause to believe that "fruits of a crime may be present").

Probable cause consists of "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *See United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990); *Smith*, 510 F.3d at 648. Moreover, courts evaluate probable cause by examining the totality of the circumstances based upon "objective facts known . . . at the time of the search." *See Smith v. Thornburg*, 136 F.3d 1070, 1075 (6th Cir. 1998); *Smith*, 510 F.3d at 648 (noting that courts do not "look to events that occurred after the search or to the subjective intent of the officers" to determine the existence of probable cause).

Significantly, the Court must analyze for probable cause based on the collective knowledge of officers involved in the subject search at the relevant time. As the Sixth Circuit has stated, "Many circuits, including our own, have determined that probable cause may be established from the collective knowledge of the police rather than solely from the officer" himself. *See Willis v. Neal*, 247 F. App'x. 738, 742-43 (6th Cir. 2007); *United States v. Yoon*, 398 F.3d 802, 812 (6th Cir. 2005)(Gilman, J., dissenting)(noting that "courts have imputed collective knowledge about criminal investigations to law enforcement officials" and citing cases "describing the collective knowledge theory as imputing mutual knowledge to 'a group of agents in close communication with one other'")(citation omitted); *United States v. Fofo*, 39 F. App'x. 180, 183 (6th Cir. 2002)(validating search and noting: "There is no question but that the collective knowledge of law enforcement personnel cooperating on this case gave them probable cause to believe that heroin was being transported in the rental car.").

19

In the Court's view, the key moment of assessment is just before Director Gilbert opened the vehicle–when he opened that door, he searched the car. As such, the Court must evaluate whether authorities had probable cause to search at that time. Based on collective knowledge of the involved authorities, was there a "fair probability that contraband or evidence of a crime" would be found in the vehicle? *See United States v. Padro*, 52 F.3d 120, 122-23 (6th Cir. 1995). Based on a commonsense analysis of the totality presented, the Court answers in the affirmative, thus validating the search.

When Gilbert opened the door, police knew the following:

-- The Task Force had an active pending investigation involving Michael Redmond and had "continually" received complaints about Redmond making meth. *See* Tr., at 44. [Neither witness specified the basis or source of any such complaints, but the Task Force did have two agents assigned to Michael Redmond as of July of 2008.]

-- As recently as December of 2007, Whitaker had been to the Breezy Hills address after Wal-Mart complained of Michael Redmond attempting to steal meth-making ingredients, *i.e.*, lithium batteries (after buying other such ingredients at Wal-Mart). Whitaker confirmed by review of a Wal-Mart receipt that Redmond had just bought some ingredients Whitaker specifically associated with meth-making.

-- Whitaker found actual, finished meth at the residence on that occasion.

-- Whitaker interviewed Ami Beckman and Casey Redmond (the son of Michael and Nannette), who a) admitted securing ingredients for Michael Redmond and admitted that Redmond used the ingredients for meth production; and b) directly implicated Nannette Redmond in helping Michael Redmond acquire meth-making ingredients.

-- Whitaker specifically smelled what he believed to be an odor consistent with meth-making ingredients, although he could not locate the source of the smell on the premises.

-- Prior to July of 2008, the Redmond garage had burned down and the garage featured a graphic, spray-painted warning (skull with teeth; warning about "accidents") on the wall. *See* Tr. at 20.

-- As of July 2008, the Redmonds had a criminal history relevant to the evaluation of the conduct presented. Thus, Michael Redmond had multiple controlled substance felony convictions, with the most recent (2) from 2002 resulting in two years in

prison for illegal possession.   Nannette Redmond had a drug paraphernalia conviction from 2006 and, evidently, a dismissed weapon charge.

-- In July 2008, Lowe's alerted Gilbert to a female purchasing two cannisters of Roebic drain cleaner (totaling 40 ounces).  Lowe's gave Gilbert a detailed physical description and a detailed description of the vehicle (including plate) driven by the female.  The physical description included reference to the female's "iodine fingers," which Gilbert associated with meth production.  Gilbert is a highly qualified and experienced law enforcement officer with significant expertise in investigation of meth manufacturing.

-- The quantity and make of drain cleaner aroused particular suspicion from Gilbert; he believed, based on his training and experience, that the quantity would not be for individual use.  Further, he specifically linked the Roebic crystals from Lowe's to meth production in the Somerset area.

-- Gilbert immediately checked the plate number, which returned as registered to Michael Redmond.   Gilbert then immediately left his Somerset home and encountered the vehicle headed toward the 301 Breezy Hills address (known to be Michael Redmond's residence).

-- The vehicle parked at 301 Breezy Hills.  Gilbert approached the female driver, who matched the physical description provided by Lowe's.  Her license identified the female as Nannette Redmond and provided the same 301 Breezy Hills residential address.

-- Michael Redmond appeared immediately, from the garage area at the residence. Both he and Nannette Redmond denied consent to search the truck.

-- In noncustodial questioning, Nannette Redmond claimed she was only stopping by the Breezy Hills residence and that she was taking the purchased drain cleaner "to a friend."

-- Finally, prior to opening the door, Gilbert looked through the passenger side window and saw a partially covered shopping bag on the floor.[10]  He testified that in that bag he could see enough of a spray can (about one inch of a yellow can) to identify what he believed to be Prestone starter fluid, which he referenced as another ingredient in meth making.  Gilbert was supremely confident that what he could see through the window was, in fact, a can of starter fluid.   Thus, he perceived the existence of another meth-making ingredient, in addition to the Roebic that Nannette Redmond allegedly, indeed admittedly, had purchased.

---

[10]

Law enforcement took some photos of the truck floor.  *See* DE #75 Tr., at 87-88 (photos). None of them fairly represents what Gilbert saw through the window, because Gilbert lifted and then replaced the orange posterboard and because the photos do not capture the same perspective Gilbert originally had.  Thus, the photo evidence of the disturbed scene is of little use.

21

This information combined to provide Gilbert probable cause to open the truck's door. Although the purchase of drain cleaner usually is innocent conduct, Nannette Redmond did not make that purchase in a vacuum that day. Rather, because of her and her close family members' conduct and history, police rightfully viewed the act with suspicion. She was in Michael Redmond's truck, drove back to the residence (a prior suspected meth-making site), and met Michael Redmond. She gave a contextually implausible story (*i.e.*, that she was taking 40 ounces of drain cleaner – a suspect quantity – to a "friend"). Police knew, from Nannette Redmond's own son, that she had helped secure meth ingredients for Michael Redmond as recently as December of 2007,[11] when police found finished meth, discovered Michael Redmond's documented efforts to collect meth ingredients, and smelled suspected production. Police fairly believed that Nannette Redmond purchased the Roebic as part of a meth-making endeavor, and Gilbert's positive identification of the starter fluid, as a second ingredient in the floorboard of the truck, solidified that belief and completed the basis for probable cause to search. Gilbert had well more than "mere suspicion," and indeed there was a fair probability, that the truck contained evidence of a crime, that is, elements intended for the unlawful

---

[11]    The defense treats this information as dated and stale. While an attempt to rely on the December 2007 information alone to secure a warrant in July 2008 may have been problematic, police had information of immediate conduct in July that, in the Court's view, reasonably connected to the December events. Nannette Redmond's Roebic purchase, along with the other circumstances discussed, indicated that the events of 2007, which centered on suspected meth production, properly remained an item of current concern and interest as to these persons and as to this location. *See United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006)("The expiration of probable cause is determined by the circumstances of each case, and depends on the inherent nature of the crime. Relevant variables include 'the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?)[, and] the place to be searched (mere criminal forum of convenience or secure operational base?).'")(internal citations omitted). Law enforcement rationally viewed Nannette Redmond's 2008 conduct in light of information gathered in and indicating illegal activity in 2007.

22

production of meth.  Authorities lawfully searched the vehicle on the date in question, validating

discovery of the starter fluid, peroxide, and drain cleaner.

### B. Search of the Home

As noted previously, *see supra* n. 9, Defendants do not argue that the warrant application in

its original form failed to provide probable cause to the state judge that authorized the Breezy Hills

search.  The defense effort sought to exclude the portion of the application that included evidence

from the truck.  However, because the truck search was proper, the application in its entirety

survives  and the state warrant issued is beyond reproach on its four corners.

## IV. *Miranda*

> Prior to any custodial interrogation, an officer must warn the individual in custody that he
> has the right to remain silent, that anything he says can be used against him in a court of law,
> that he has the right to the presence of an attorney, and that if he cannot afford an attorney
> one will be appointed for him prior to any questioning if he so desires.

*See Miranda v. Arizona*, 86 S. Ct. 1602, 1630 (1966). Without the requisite warning, any statement

secured via custodial interrogation will not be admissible in a subsequent trial. *See id.* ("[U]nless

and until such warnings . . . are demonstrated by the prosecution at trial, no evidence obtained as a

result of interrogation can be used[.]").  A defendant bears the burden of establishing that a scenario

invoked *Miranda's* obligations.  *See United States v. Donaldson*, 493 F. Supp. 2d 998, 1003 (S.D.

Ohio 2006).  For purposes of *Miranda*, a person is "in custody" when, under the circumstances

surrounding the interrogation, the person was under "'formal arrest or [experienced] restraint on

freedom of movement' of the degree associated with a formal arrest." *See California v. Beheler*, 103

S. Ct. 3517, 3520 (1983)(quoting *Oregon v. Mathiason*, 97 S. Ct. 711, 714 (1977)).  Furthermore,

an "interrogation" in this context "refers not only to express questioning, but also to any words or

actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response[.]" *See Rhode Island v. Innis*, 100 S. Ct. 1682, 1689-90 (1980).

In the motion to suppress, Defendant Nannette Redmond, through counsel, proffered "that she was not read her Miranda Rights until several hours had passed[.]" *See* DE #53 N. R. Motion, at 6. At the evidentiary hearing, counsel for Defendant Nannette Redmond attempted to contest Gilbert's assertion that he read Defendant her *Miranda* rights before asking about the location of the allegedly-purchased Roebic drain cleaner. *See* DE #75 Tr., at 58. In response, Gilbert consistently testified that he read the *Miranda* rights before speaking to Nannette Redmond in the backseat of the deputy's cruiser. *See id.* at 27, 57-60. Because Defendant produced no evidence to the contrary, the Court finds that Gilbert properly *Mirandized* Nannette Redmond prior to eliciting the statements regarding the location of the Roebic drain cleaner and her intent "to cook."

In her post-hearing brief, Defendant Nannette Redmond, through counsel, also argued that Gilbert should have provided *Miranda* warnings prior to searching the truck. *See* DE #79 N. R. Post-Hearing Brief, at 11 ("[I]f Director Gilbert felt that he had probable cause to search the vehicle, he should have warned Nannette Redmond of her Miranda Rights prior to his search of the same."). However, the search was not custodial interrogation. Gilbert did not arrest Nannette Redmond until after he searched the truck and discovered the three cans of Prestone starter fluid. Even though Gilbert asked the sheriff's deputies to watch Defendants Nannette and Michael Redmond while he searched the truck, neither one of the defendants "'[experienced] restraint on freedom of movement' of the degree associated with a formal arrest." *See Beheler*, 103 S. Ct. at 3520. Moreover, Gilbert did not question Defendants during his search nor make any gestures or remarks intended "to elicit

24

an incriminating response." *See Innis*, 100 S. Ct. at 1690.  Therefore, Gilbert complied with *Miranda*, and the Court rejects Nannette Redmond's theories related to that law enforcement duty.

## V. Recommendation

For the reasons discussed above, the Court recommends that the District Court DENY the Motions to Suppress as to the items found in the truck and the residence and as to the post-*Miranda* statements Defendant Nannette Redmond made to Director Gilbert.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of that statute.  As defined by § 636(b)(1) and Federal Rule of Criminal Procedure 59(b), within ten days after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for de novo consideration by the District Court.  The parties should consult the aforementioned statute and rule for specific appeal rights and mechanics.  Failure to object in accordance with Rule 59(b) waives a party's right to review.

This the 9th day of February, 2009.

G:\Suppression\Redmond.wpd

Signed By:

**Robert E. Wier**

**United States Magistrate Judge**

25